UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
EASTERN DIVISION

| | |
|---|---|
| SHARON MCDONALD,<br>　　　Plaintiff<br><br>vs.<br><br>CITY OF BOSTON and<br>RICHARD WALKER,<br>　　　Defendants | C.A. NO.: 1:15-CV-11915-JGD |

**PLAINTIFF'S MEMORANDUM IN SUPPORT OF HER MOTION
FOR PARTIAL SUMMARY JUDGMENT ON LIABILITY**

　　The plaintiff files this memorandum in support of her motion for summary judgment on liability as to her negligence and section 1983 claims as there is no dispute of fact regarding the plaintiff's wrongful arrest.  The Boston Police Department, after an extensive investigation, found that detective Walker had neglected his duties in the arrest of Sharon McDonald.  In addition, the defendants have failed to produce the surveillance video, in viewable form, Detective Walker allegedly relied on in seeking an arrest warrant.  Accordingly, the plaintiff requests that the Court enter judgment on liability in her favor on her negligence and section 1983 claims.

**RELEVANT UNDISPUTED FACTS**

　　On or about May 22, 2012, four African American females entered a clothing store called Madd Rags, located at 690 American Legion Highway, in Roslindale.  These individuals allegedly took merchandise from the store and assaulted employees, while brandishing a knife.  PSOF, ¶1-2.  Detective Walker responded to Madd Rags after the incident and spoke to the store

1

clerks who indicated that the assailants had fled the scene in a green 1992 Honda Civic with Massachusetts registration 118SJ4. PSOF, ¶3.

An investigating officer accessed the Registry of Motor Vehicles database and determined that the getaway car was owned and registered to Fitzroy Swift of Dorchester. PSOF, ¶5. On the same day of the robbery, Detective Walker and Detective Van Dyke went to Mr. Swift's house in Dorchester where they were greeted by a female who identified herself as Faith Swift, a sister of Fitzroy Swift. PSOF, ¶6. Although Ms. Swift indicated that Mr. Swift did not live there, she called him on the telephone and handed the phone to Detective Walker. PSOF, ¶7-8.

Mr. Swift would not meet with Detective Walker or provide his location or address, however, he told Detective Walker that he had registered the Honda Civic for a friend named "Sharon McDonald." Mr. Swift identified Ms. McDonald as being of Jamaican descent; that she was 5' 3" tall; had a several daughters and lived in Brockton. PSOF, ¶8-11. Mr. Swift also gave Detective Walker a telephone number for Sharon McDonald. Upon returning to the station, Detective Walker ran a Registry of Motor Vehicles check for "Sharon McDonalds" with a license and only one name came up in Brockton, which happened to be the plaintiff. PSOF, ¶13. The plaintiff's license picture was five years old and she was listed as 5'8" tall. PSOF, ¶18.

While back at the station, Detective Walker called the telephone number Mr. Swift had provided for Sharon McDonald. He was unable to reach her and left a message. Within five minutes of his call, Detective Walker received a call back from a female with a pronounced Jamaican accent. When questioned by Detective Walker, the Sharon McDonald on the phone indicated that she did not know anybody named "Fitz" and had no idea about a robbery, but stated "if you explain to me what happened, I can tell you in return what happened." PSOF, ¶14-15. Detective Walker asked the caller to come to the station and she refused. He then told her

2

that he would get a warrant for her arrest and that he knew her address, to which she responded "Good luck getting into the house", and then the call ended. PSOF, ¶16.

Detective Walker ran Mr. Swift's criminal record which revealed over 31 charges, including charges for receipt of stolen property, repeated shoplifting, larceny, forgery, uttering, breaking and entering nighttime, armed robbery and numerous drug related charges. Detective Walker also ran the plaintiff's criminal record which came up negative for any criminal charges. PSOF, ¶17, 20. On the night of the robbery, Detective Walker assembled a photo array which included the plaintiff's five-year-old driver's license picture and several other photographs. On May 23, 2012, the day after the robbery, Detective Walker requested another detective to present the colored photo array to the two eyewitnesses, the Madd Rags store clerks. Neither of the witnesses identified the plaintiff from the photo array. PSOF, ¶19.

On June 1, 2016, Detective Walker obtained the surveillance videos from Madd Rags. The quality of the video was not good. PSOF, ¶21. The defendants produced four surveillance videos in discovery. At his deposition, Detective Walker could not identify the assailants on the videos produced by the defendants or any features of the assailants. PSOF, ¶21-22. The video of the altercation produced by the defendants, which contains images of the perpetrators and was the basis of Detective Walker's identification of the plaintiff, was pixilated and of poor quality. Detective Walker testified that he could not identify the images on the video or from the still photographs produced by the defendants from the videos. PSOF, ¶22.

Detective Walker claims to have viewed a better video of the altercation than the one produced in discovery by the defendants and which was viewed at his deposition. PSOF, ¶22, 27. However, after repeated requests by the plaintiff, including a Rule 30(b)(6) deposition notice requesting the video, the defendants have failed to produce any different videos or a non-

pixilated video of the altercation that was allegedly viewed by Detective Walker. PSOF, ¶24. Prior to viewing the videos, Detective Walker admits he did not have probable cause to seek an arrest warrant and that he relied on his identification of the plaintiff in the altercation video as the basis for probable cause to seek the warrant. Detective Walker sought the arrest warrant, despite the fact that he could not see any discernible facial features from the video. Nor did he make any specific description of his alleged observations from the video in his supplemental police report. PSOF, ¶23-27,

After viewing the videos, Detective Walker sought an arrest warrant for Sharon McDonald of 129 Pine Grove Drive, Brockton for armed robbery and larceny over $250 from the West Roxbury District Court. PSOF, ¶30. Detective Walker's application for an arrest warrant and his supporting supplemental report failed to advise the clerk magistrate of the two failed photo arrays presented to the victims. Detective Walker indicated that his failure to mention the failed photo arrays in his report was an "oversight" and that it was important for the Clerk Magistrate to know that the victims in the case could not identify the suspect in photo arrays. PSOF, ¶32. In addition to not disclosing the two failed photo arrays, Detective Walker failed to also disclose a) the low quality of the surveillance video and the inability to identify facial features in the video; b) the physical differences in height and weight between the plaintiff and the "Sharon McDonald" described by Mr. Swift; c) the long criminal record of Mr. Swift, d) Mr. Swift's ownership of the get away car and his potential involvement in the crime as the provider of the get away vehicle; e) the fact that Mr. Swift refused to meet with Detective Walker or provide his address to him; f) the fact that Detective Walker interviewed Mr. Swift over the telephone and not in person and never affirmatively identified him; and g) the lack of a criminal record for the plaintiff. PSOF, ¶33.

Based on the issuance of the arrest warrant, Ms. McDonald was arrested by Brockton police, transported to the Brockton Police Station and then transferred to the West Roxbury District Court. At her arraignment, Ms. McDonald was unable to make the $5,000 cash bail set by the court. She was held in prison for eight days until her release on personal recognizance after a bail review in Superior Court. PSOF, ¶34-35.

Detective Walker spoke to Ms. McDonald for the first time on July 10, 2012 prior to a hearing on her Motion to Dismiss. Detective Walker immediately determined that she was not the suspect he was after based on her physical appearance, lack of Jamaican accent, the fact that she had a different telephone number and a different vehicle registered in her name, among other obvious facts. PSOF, ¶36-39. On July 9, 2012, the day prior to meeting Ms. McDonald in court, Detective Walker had shown a photo array to Mr. Swift who also failed to identify Mrs. McDonald as the "Sharon McDonald" that he knew. PSOF, ¶40. On July 23, 2012, the Court (Desmond, J.) "Allowed" the Motion to Dismiss as Ms. McDonald "is not the proper subject of criminal complaint #1206CR1255 and was wrongfully charged herein." PSOF, ¶41.

In response to a complaint by the plaintiff that she was wrongfully arrested, the Internal Affairs Division of the Boston Police Department conducted a thorough factual investigation of her arrest. This included an interview of Detective Walker and the plaintiff, a review of the investigative file and the criminal case file. PSOF, ¶42, Exhibit 7 (IAD Report). After conducting an extensive investigation, Lieutenant Detective Adrian Troy of the Internal Affairs Division issued a report ("IAD Report") dated July 2, 2015 containing its findings and recommendations. The IAD report concluded with the recommendation that a neglect of duty violation against Detective Walker be sustained. PSOF, ¶44.

The IAD Report found in part: "Mr. Swift however has an extensive criminal history

(some 31 charges) dating back to 1989. Mr. Swift's convictions include a litany of drug offences and a conviction for Armed Robbery. Detective Walker had no knowledge of Mr. Swift's credibility, nor had he established his reliability. Detective Walker by his own admission did not meet or show Mr. Swift a photo array until after Mrs. McDonald's arrest." PSOF, ¶45. The section of the IAD Report entitled "Findings/Recommendations," contained the following: "Detective Walker had no frame of reference for Mr. Swift's veracity and had not established his reliability or credibility, yet he based his entire investigation on an indiscriminate name from a city of 100,000 people, furnished during a telephone conversation with an unknown entity." PSOF, ¶46. The same section of the IAD Report states: "Based on Mr. Swift's information Detective Walker focused on Mrs. Sharon McDonald of Brockton, conducted a BOP on her and printed her License Picture. He then compiled a photo array including Mrs. Sharon McDonald and showed it to the two victims, who failed to pick out Mrs. Sharon McDonald as a suspect." PSOF, ¶47.

The same section of the IAD Report continued: "The following details should have been cautionary indicators to Detective Walker and should have at a bare minimum compelled him to investigate further:

> *- The use of a common name allegedly from a city of 100,000 people.*
> *- Mrs. Sharon McDonald's complete absence of criminal history.*
> *- Mr. Swift's extensive criminal history, including an Armed Robbery conviction*
> *- Mr. Swift's reluctance to meet with Detective Walker*
> *- The use of a 5-year-old License picture of Mrs. McDonald in the photo array.*
> *- The failure of the victims to identify Mrs. Sharon McDonald from a photo array.*
> *- Detective Walker's reliance on uncorroborated information from a telephone conversation with an unknown entity without establishing his reliability or credibility.*"

PSOF, ¶48. The IAD Report further concluded: "Based on the information available, Detective Walker was remiss in seeking an Arrest Warrant for Mrs. Sharon McDonald. To seek even a

Criminal Hearing against Mrs. Sharon McDonald based on the information Detective Walker had uncovered in his month-long investigation would have been dubious, yet it would have been the most prudent course of action and would have averted Mrs. Sharon McDonald's 8 day incarceration." PSOF, ¶49.

Finally, the IAD Report's concluding recommendation was as follows: "This investigation disclosed sufficient evidence to support the allegation that Detective Walker's scant investigation and reliance on uncorroborated information from a telephone conversation with an unknown entity without establishing his reliability or credibility led directly to the wrongful 8 day incarceration of Mrs. Sharon McDonald. **Violation of Rule 102, Sec 4, Neglect of Duty Sustained**." PSOF, ¶50 (bold and underline in original). The IAD Report was signed by Lieutenant Detective Troy and provided to Deputy Superintendent Jeffrey I. Walcott, Assistant Chief, Bureau of Professional Standards. PSOF, ¶51. The contents of the IAD Report were noted and approved by Superintendent Frank Mancini, Chief, Bureau of Professional Standards who signed the last page of the report. PSOF, ¶51.

On July 6, 2015, Deputy Superintendent Walcott submitted the report to Police Commissioner William B. Evans who initialed the IAD Report as "Reviewed by Police Commissioner and Forwarded to IAD." PSOF, ¶52. Thereafter, on August 5, 2015, Deputy Superintendent Walcott issued three memoranda, all with the same content, to Superintendent Gregory P. Long (Commander, Bureau of Investigative Services), Deputy Superintendent John M. Brown (Commander, B.I.S., Criminal Division Investigative Division) and Detective Walker. The memoranda all stated: "In reference to the above-mentioned subject matter, please be advised that the Internal Investigation Unit has completed its inquiry. After a thorough investigation, the Internal Investigations Unit has determined that the complaint for Violation of

Rule(s) 102, §4 be classified as Sustained." PSOF, ¶53. Superintendent Frank A. Mancini, Bureau of Professional Standards then sent Mrs. McDonald C/O her attorney, a letter dated August 7, 2015 which stated: "A careful review of the facts surrounding the incident about which you complained has concluded. We have sustained a charge of 'Neglect of Duty' against Detective Walker and he may subsequently be disciplined on this matter." PSOF, ¶54. Detective Walker did not appeal the IAD's findings and conclusions. PSOF, ¶56.

## I.     SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if there is no genuine dispute as to any material fact and the undisputed facts show that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56 (a). The moving party bears the burden of showing the basis for its motion and identifying where there exists a lack of any genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). The nonmovant must point to competent evidence and specific facts to stave off summary judgment. Tropigas de Puerto Rico, Inc. v. Certain Underwriters at Lloyd's of London, 637 F.3d 53, 56 (1st Cir. 2011)(citation omitted); ATC Realty, LLC v. Town of Kingston, 303 F.3d 91, 94 (1st Cir. 2002). The non-movant 'must come forward with evidence sufficient for a 'a fair-minded jury [to] return a verdict' in his favor.' Soto-Padro v. Public Bldgs. Auth., 675 F.3d 1, 5 (1st Cir. 2012) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)). While the Court 'view[s] the record in the light most favorable to the nonmovant, drawing reasonable inferences in his favor,' Noonan v. Staples, Inc., 556 F.3d 20, 25 (1st Cir. 2009), it 'afford[s] no evidentiary weight to 'conclusory allegations, empty rhetoric, unsupported speculation, or evidence which, in the aggregate, is less than significantly probative.'' Tropigas

8

de P.R., Inc., 637 F.3d at 56 (quoting Rogan v. City of Boston, 267 F.3d 24, 27 (1st Cir. 2001)); see Feliciano de la Cruz v. El Conquistador Resort & Country Club, 218 F.3d 1, 5 (1st Cir. 2000)." Newman v. European Aeronautic Defence & Space Co., 2012 U.S. Dist. LEXIS 107387, 4-6 (D. Mass. Aug. 1, 2012).

## II. ARGUMENT

### A. There Is No Factual Dispute that the Defendant Walker Breached the Duty of Care He Owed to the Plaintiff

To prevail on a negligence claim, a plaintiff must establish that "(1) the defendant owed the plaintiff a duty of reasonable care; (2) the defendant breached this duty; (3) damage to the plaintiff resulted; and (4) the breach of the duty caused this damage." Brown v. United States, 557 F.3d 1, 3 (1st Cir. 2009) (citing Jupin v. Kask, 447 Mass. 141, 146, 849 N.E.2d 829 (2006)).

The facts regarding liability, both before and after the wrongful arrest, are not in dispute. Detective Walker conductive a cursory and incomplete investigation that lead to the Plaintiff's wrongful arrest and incarceration. The only liability witnesses – Detective Walker and the City – recount the same facts.

The IAD report concludes that Detective Walker neglected his duties as a detective. As detailed in the PSOF, the IAD report contained the following factual findings: 1) Detective Walker had no knowledge of Mr. Swift's credibility, nor had he established his reliability; 2) Detective Walker by his own admission did not meet or show Mr. Swift a photo array until after Mrs. McDonald's arrest."; 3) "Detective Walker had no frame of reference for Mr. Swift's veracity and had not established his reliability or credibility, yet he based his entire investigation on an indiscriminate name from a city of 100,000 people, furnished during a telephone conversation with an unknown entity." PSOF, ¶ 45-46.

The IAD Report also concluded: "Based in the information available, Detective Walker was remiss in seeking an Arrest Warrant for Mrs. Sharon McDonald.  To seek even a Criminal Hearing against Mrs. Sharon McDonald based on the information Detective Walker had uncovered in his month-long investigation would have been dubious, yet it would have been the most prudent course of action and would have averted Mrs. Sharon McDonald's 8 day incarceration." PSOF, ¶ 49.   Finally, in sustaining a neglect of duty violation, the IAD Report concluded as follows: "This investigation disclosed sufficient evidence to support the allegation that Detective Walker's scant investigation and reliance on uncorroborated information from a telephone conversation with an unknown entity without establishing his reliability or credibility led directly to the wrongful 8 day incarceration of Mrs. Sharon McDonald."  PSOF, ¶ 50.

The factual findings and conclusions in the IAD Report are admissions of the Boston Police Department and the City.  Detective Walker did not appeal the decision of the BPD when it concluded that he neglected his duties.  PSOF, ¶ 56.  The City, via the IAD, has already made a determination that Detective Walker was negligent.  "Neglect of Duty" is defined as: "This includes any conduct or omission which is not in accordance with established and ordinary duties or procedures as to such employees or which constitutes use of unreasonable judgment in the exercising of any discretion granted to an employee." Boston Police Department Rule 102, Section 4.  Detective Walker's negligence was rooted in his failures and omissions when conducting his investigation and presenting evidence to the clerk magistrate for the issuance of the arrest warrant. Detective Walker even admits that it was an "oversight" not to inform the clerk magistrate of the two failed photo arrays, which he testified was a departure from his usual practice, and was important for the Clerk Magistrate to know in evaluating the request to issue criminal charges and the warrant.  PSOF, ¶ 32.  Given the factual findings and conclusions in the

10

City's IAD report, which operate as admissions against the City, coupled with Detective Walker's own testimony that it was an oversight not to inform the clerk magistrate of the failed photo arrays, there is no dispute that Detective Walker breached the duty he owed to the plaintiff. The City, in turn, is liable for acts and omissions of Detective Walker under the Massachusetts Torts Claims Act. Accordingly, partial summary judgment as to liability should issue for the plaintiff on her negligence claims against the City.

**B.     The IAD Report Is Admissible Against Detective Walker and the City**

Federal Rule of Evidence 803(8)(C) specifically provides for the admissibility of the IAD report. As the First Circuit has noted: "*Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 102 L. Ed. 2d 445, 109 S. Ct. 439 (1988), settled a long-standing conflict among the circuits regarding the admissibility, under Federal Rule of Evidence 803(8)(C)[1], of accident reports containing investigators' conclusions and opinions. The Court held that "statements in the form of opinions or conclusions are not by that fact excluded from the scope of Federal Rule of Evidence 803(8)(C)." Id. at 175. The test for admissibility is two-fold: "As long as the conclusion is [1] based on a factual investigation and [2] satisfies the Rule's trustworthiness requirement, it should be admissible along with other portions of the report." Id. at 170. Other rules, such as Rule 403, provide additional evidentiary safeguards against irrelevant or prejudicial information. Id. at 168." Lubanski v. Coleco Indus., Inc., 929 F.2d 42, 45 (1st Cir. 1991).

First, the IAD Report was issued after an extensive factual investigation by the IAD which included interviews of the plaintiff and defendant, a review of the court file and a review of Detective Walker's file. See PSOF, Exhibits 7 and 9. The memoranda issued by Deputy

---

[1] Rule 803(8)(A)(iii) creates a hearsay exception for "[a] record or statement of a public office if it sets out… in a civil case… factual findings from a legally authorized investigation," unless "the source of information or other circumstances indicate a lack of trustworthiness." Fed. R. Evid. 803(8)(A)(iii).

11

Superintendent Walcott indicating a finding of neglect of duty stated: "*After a thorough investigation*, the Internal Investigations Unit has determined that the complaint for Violation of Rule(s) 102 § 4. . ." PSOF, ¶ 53 (emphasis added).  The BPD's letter to the plaintiff stated: "*A careful review of the facts surrounding the incident* about which you complained has concluded." PSOF, ¶ 54 (emphasis added).

Second, the conclusions in the report satisfy the rule's trustworthiness requirement.  The investigation was conducted by the IAD as part of its duty to investigate civilian complaints to the BPD. The Report outlines the investigatory process, the IAD's findings and also contains its recommendations.  Upon conclusion, the IAD Report underwent a rigorous review by numerous high-ranking personnel at the BPD, including Commissioner Evans, before Deputy Superintendent Walcott notified the plaintiff of the finding of neglect of duty.  In addition, it was arguably against the City's own interests for the IAD to conclude that Detective Walker had neglected his duties.  Despite this conflict, the IAD conducted an objective and thorough investigation.  Finally, Detective Walker did not appeal the decision, thereby failing to object to the Report on any basis.

Moreover, the defendants can find no shelter in a claim that the IAD Report contains inadmissible hearsay statements.  Detective Walker is a party and his statements to the IAD are independently admissible as admissions of a party opponent. The IAD Report is admissible as unrefuted evidence that the City of Boston's employee, Detective Walker, was negligent and as Walker's employer so is the City.

C. **The Defendants' Are Unable To Establish Probable Cause, As A Matter Of Law, To Defeat The Plaintiff's 1983 Claim**

Section 1983 provides a cause of action against persons who violate federal law while

acting under color of state law. 42 U.S.C. § 1983. Qualified immunity protects a state official against § 1983 suits unless 1) the official violated the plaintiff's constitutional right and 2) that right was clearly established at the time of the violation. Pearson v. Callahan, 555 U.S. 223, 232, 129 S. Ct. 808, 172 L. Ed. 2d 565 (2009). Courts assess the "clearly established" requirement by asking whether the contours of the right were sufficiently clear and whether a reasonable official under the specific circumstances would recognize that his conduct violated a constitutional right. Maldonado v. Fontanes, 568 F.3d 263, 269 (1st Cir. 2009). In false arrest cases, the inquiry focuses on probable cause.  "'Probable cause exists when the facts and circumstances within the police officers' knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent person in believing that [suspect] had committed or was committing an offense.' United States v. Pardue, 385 F.3d 101, 107 (1st Cir. 2004) (internal quotations omitted)." McCormack v. Town of Whitman, 2013 U.S. Dist. LEXIS 38637 (D. Mass. Mar. 20, 2013); Martinez-Rodriguez v. Guevara, 597 F.3d 414, 420 (1st Cir. 2010) ("It is clearly established law that the Fourth Amendment requires that arrests be based upon probable cause." (citing Beck v. Ohio, 379 U.S. 89, 91, 85 S. Ct. 223, 13 L. Ed. 2d 142 (1964)).[2]

In a wrongful arrest case where there is no dispute of fact, the court can decide whether the plaintiff's constitutional rights have been violated.  A determination of probable cause is a legal determination.  McCormack v. Town of Whitman, 2013 U.S. Dist. LEXIS 38637, 20-21 (D. Mass. Mar. 20, 2013) citing *Swain v. Spinney*, 117 F.3d 1, 9 (1st Cir. 1997)("This prong of the inquiry, while requiring a legal determination, is highly fact specific, and may not be resolved on a motion for summary judgment when material facts are substantially in dispute."); *St. Hilaire v.*

---

[2] In its motion to dismiss, the defendant conceded that the plaintiff's "right to be free from unreasonable seizure and arrest without probable cause is and has been a [sic] clearly established [sic] for quite some time." Doc. 20, *Defendant's Memo. in Support of MTD.*, p. 5, fn. 2.

*City of Laconia*, 71 F.3d 20, 24 n. 1 (1st Cir. 1995) ("The ultimate question of whether a reasonable police officer, on the basis of information known to him, could have believed his actions were in accord with constitutional rights is a question of law, subject to resolution by the judge not the jury. But if there is a factual dispute, that factual dispute must be resolved by a fact finder."). Daley v. Harber, 234 F. Supp. 2d 27, 30-31 (D. Mass. 2002)(finding *summary judgment* in favor of the plaintiff on 1983 false arrest claim where plaintiff committed no crime, owned the motorcycle in question and officer would not allow him to obtain paperwork showing possession concluding and noting that the defendant had not established that the facts and circumstances were sufficient to warrant a prudent man in believing that the petitioner had committed or was committing an offense).

Detective Walker unequivocally testified that he believed he had no probable cause to seek an arrest warrant prior to viewing the video surveillance from Madd Rags.  PSOF, ¶¶ 25, 28.  By that point, the two victims had failed to identify the plaintiff in photo arrays.  Detective Walker claimed in his testimony that he viewed a video of the assailants in Madd Rags where one of the assailants had a similar round face, and the same length hair as the plaintiff as she appeared in a five year old license picture.  PSOF, ¶ 25.  He further testified that he was unable to discern facial features from the video.  PSOF, ¶ 25.

In their Initial Disclosures, the defendants produced a series of videos which were copies of the videos from Madd Rags surveillance system.  The plaintiff questioned Detective Walker at his deposition about the videos and played portions of the videos to him, requesting that he identify the video he relied on to seek the arrest warrant.  PSOF, ¶ 22.  Detective Walker identified "Clip 2" as the video of the assailants in the store.  However, the "Clip 2" video produced by the defendants was pixilated and of poor quality whereby Detective Walker could

not identify the assailants on the video. PSOF, ¶ 22.

After Detective Walker's deposition, the plaintiff's served a Rule 30(b)(6) deposition notice on the City which requested all of the original videos the City had obtained from Madd Rags. No new, different or better quality videos were produced by the City in response to the plaintiff's deposition notice. PSOF, ¶ 24.

Accordingly, after repeated requests, including a deposition notice to produce the original videos viewed by Detective Walker, the City has failed to produce the video Detective Walker relied on to make his probable cause determination. The defendants have only produced a poor quality video of the altercation in Madd Rags where the assailants, let alone their physical features, cannot be identified.

By his own admission, the lynchpin of Detective Walker's claim that he had probable cause to seek an arrest warrant is *his alleged identification of the plaintiff* on the Madd Rags' surveillance video when compared to a five-year-old picture of the plaintiff on her driver's license. Detective Walker testified that he viewed a clearer version of the video of the altercation provided by Madd Rags than he was shown at his deposition, but it was of the same quality as the videos that were not pixilated. However, the defendants, after several years of litigation and numerous requests, have failed to produce the original version of the video Detective Walker claims he viewed to form probable cause. Or, if the defendants have produced that video as "Clip 2", as identified at Detective Walker's deposition, Clip 2 is also admittedly of such poor quality that Detective Walker could not identify any features of the assailants from the video.

Detective Walker's deposition testimony about what he recalls from viewing a video over three years prior to his deposition is inadmissible hearsay and cannot be offered at summary judgment or trial to establish the truth of the images on the video. The copies of the video

produced by the City are actually multiple hearsay as the original video would be the video as recorded in Madd Rags' surveillance system. There has been no evidence offered by the defendants to even establish the authenticity and reliability of the video they claimed to have obtained from Madd Rags as being a true and accurate copy of the original video or that the video is even of the same quality, size (i.e. enhanced or not), clarity and file format as the original Madd Rags video. The same argument can be made for the copies of the videos produced by the defendants from the copies they received from Madd Rags.

Without this crucial piece of evidence, the defendants cannot establish that Detective Walker had probable cause to seek an arrest warrant. By his own admission, Detective Walker relied on the video for the probable cause required to seek the arrest warrant. Without the video he, again admittedly, did not have probable cause after the two failed photo arrays. Detective Walker's hearsay testimony about what he saw on the video is inadmissible.

**D.     The Defendants' Evidence of Probable Cause Should Be Excluded Due to the Spoliation of the Videotape**

Spoliation is defined as the failure to preserve evidence that is relevant to pending or potential litigation. Litigants have the responsibility of ensuring that relevant evidence is protected from loss or destruction. A litigant has a duty to preserve relevant evidence. The obligation to preserve relevant evidence arises once litigation is reasonably anticipated. Am. Health, Inc. v. Chevere, 37 F. Supp. 3d 561, 564-65 (D.P.R. 2014) citing Jimenez-Sanchez v. Caribbean Restaurants, LLC, 483 F.Supp.2d 140, 143 (D.P.R. 2007); Perez v. Hyundai Motor Co., 440 F.Supp.2d 57, 60 (D.P.R. 2006).

"In order for a Court to find that sanctionable spoliation has occurred, three conditions must be satisfied. First, there must be evidence of actual destruction of documents. Second, the

party responsible for the documentary destruction must have been on notice of both the potential for litigation, and, third, the potential relevance of the destroyed documents to any possible litigation. See *Gomez v. Stop & Shop Supermarket Co.*, 670 F.3d 395, 399 (1st Cir. 2012) (citing *Testa v. Wal-Mart Stores, Inc.*, 144 F.3d 173, 177 (1st Cir. 1998)); *Booker v. Massachusetts Dept. of Public Health*, 612 F.3d 34, 45-46 (1st Cir. 2010). Once a Court is satisfied that evidence has been despoiled, a range of sanctions are available including dismissal, exclusion of evidence, a negative inference, and monetary sanctions." Ezenia! Inc. v. Nguyen (In re Ezenia! Inc.), 2015 BNH 005, 536 B.R. 485, 518-19. The exclusion of evidence or testimony is permitted to rectify prejudice to the non-offending party. Am. Health, Inc. v. Chevere, 37 F. Supp. 3d 561, 566 (D.P.R. 2014). Moreover, bad faith or comparable bad motive is not required for the court to exclude evidence in situations involving spoliation. Trull v. Volkswagen of America, Inc., 187 F.3d 88, 95 (1st Cir. 1999).

Based on Detective Walker's testimony, he viewed a video of the assailants shortly after the robbery which he used to identify the plaintiff from the picture on her driver's license. He testified at his deposition that the video file of the altercation produced by the defendants and shown to him at his deposition was not of the same quality as he viewed shortly after the robbery, as he could not identify the assailants in the video at his deposition or any particular characteristics of the persons in the video. Detective Walker further testified that without the identification of the plaintiff from the video, he did not believe he had probable cause to seek an arrest warrant.

As indicated by Detective Walker in his July 13, 2012 memorandum to Captain Gillesspie, "[t]he video of the incident was forwarded to the Boston Police Forensic Unit for enhancement." PSOF, Exhibit 4, p. 2, ¶ 3. The videos remained as inventoried evidence with the

17

BPD. The BPD and the City were clearly on notice of the potential for litigation because of the District Court judge's dismissal of her criminal case and the plaintiff's filing of a complaint with the BPD, which was investigated by IAD. The IAD Report makes no mention of the quality of the videos.

The video of the altercation viewed by Detective Walker and the one provided to the plaintiff in discovery are not the same video based on Detective Walker's testimony. The video produced in discovery is either a different video or a damaged video. No matter which, the defendants failed to preserve and produce the video viewed by Detective Walker when identifying the plaintiff for his probable cause determination. The video is essential evidence in the case as the issue of probable cause strikes at the heart of a section 1983 wrongful arrest claim and also pertains to the plaintiff's other claims. Without this evidence, the plaintiff is extremely prejudiced as she is unfairly hindered in her ability to counter the defendant's claims that Detective Walker had probable cause to seek an arrest warrant.

"Prejudice is measured by the degree to which [plaintiff's] ability to mount an adequate defense has been hampered." Perez-Velasco v. Suzuki Motor Co., 266 F. Supp. 2d 266, 269 (D.P.R. 2003). Here the plaintiff is requesting that the Court exclude evidence of probable cause or, at a minimum, preclude evidence of the video of the altercation and any and all testimony or documents which reference the video and/or the identification of the plaintiff from the video.

**E.     Detective Walker Lacked Probable Cause As a Matter of Law to Seek An Arrest Warrant for the Plaintiff**

The IAD Report concluded as follows: "Based on the information available, Detective Walker was remiss in seeking an Arrest Warrant for Mrs. Sharon McDonald. To seek even a Criminal Hearing against Mrs. Sharon McDonald based on the information Detective Walker had

uncovered in his month long investigation would have been dubious, yet it would have been the most prudent course of action and would have averted Mrs. Sharon McDonald's 8 day incarceration." PSOF, Exhibit 7, p. 3, ¶3.  When factoring in the poor quality of either version of the video of the altercation, Detective Walker's probable cause determination is even more troubling.  These IAD conclusions are admissions of the City which undisputedly establish that Detective Walker lacked probable cause, i.e. "was remiss in seeking" an arrest warrant.

### III.   CONCLUSION

The plaintiff requests that the Court issue partial summary judgment as to liability on her negligence and section 1983 claims.

On behalf of the plaintiff,

 /s/ Stephen J. Delamere
Stephen J. Delamere, Esq., BBO#: 561249
Law Office of Stephen J. Delamere, P.C.
839 Washington St., Stoughton, MA 02072
T (781) 344-0012
sdelamere@delamerelaw.com


 /s/ Carlin J. Phillips
Carlin J. Phillips, Esq., BBO #561916
PHILLIPS & GARCIA, P.C.
13 Ventura Drive, Dartmouth, MA 02747
T (508) 998-0800; F (508) 998-0919
cphillips@phillipsgarcia.com

Dated:   February 28, 2018